IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 17-cv-02785-RBJ

WESTERN STAR, LLC,

    Plaintiff,

v.

MARKETSOUP, INC. and
DANIEL WEBER,

    Defendants.

---

**ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

This matter is before the Court on plaintiff Western Star, LLC's motion for partial summary judgment and request for expedited declaratory relief (ECF No. 44). The motion has been fully briefed. ECF Nos. 44, 48, 53. For the reasons stated herein, the motion is DENIED.

## BACKGROUND

**A. Factual Background.**

This is a dispute over who owns the intellectual property and code associated with a software application. In 2014 Western Star and its CEO, Bill Bradley, began conceptualizing a desktop and mobile application known as the Starlight Trash Platform to improve the waste hauling industry (the "Starlight Application"). ECF No. 44 at 3. Western Star hired a company called Motocol in 2014 to write the software code for Starlight. *Id.* Motocol in turn hired defendant Marketsoup in August 2015 as a subcontractor on the project. *Id.* After several months of this arrangement, Western Star decided to work directly with Marketsoup, so Western Star terminated its contractual arrangement with Motocol and began the process of contracting

1

with Marketsoup.  *Id.* at 5.  Around the same time, Western Star's CEO Mr. Bradley and Marketsoup's CEO Dan Weber, also a defendant in this case, began forming a close personal friendship, even going so far as to discuss the possibility of Mr. Bradley's adopting Mr. Weber.  *Id.*

Marketsoup and Western Star began negotiating the terms of their agreement in August 2016 via a series of emails.  *See* ECF No. 44-1 at 17 (email from Mr. Bradley indicating that he wanted to "get a direct contract in place with Dan [Weber]").  The draft agreement between the parties was comprised of an Independent Contractor Agreement ("ICA") and a Statement of Work ("SOW") (collectively, "the agreement").  The parties exchanged six drafts of the agreement between August 29, 2016, and October 16, 2016.  *See* ECF Nos. 44-5–44-7, 44-10–44-12.  The last draft, containing edits in redline, was sent by Marketsoup's attorney.  ECF No. 44-12.  In his email accompanying that version, Marketsoup's attorney stated that he "look[ed] forward to you[r] thoughts and comments."  *Id.* at 2.  Western Star never responded to the October 2016 draft.

Nonetheless, the parties continued working together.  Marketsoup worked on the Starlight Application and sent Western Star invoices for its work from August 1, 2016 through November 1, 2017.  *See* ECF No. 44-8.  Marketsoup's explanation of billing (ECF No. 44-9 at 3–4) matched that set out in the SOW, which was unchanged in the draft agreements sent between August 29 and October 16, 2016.  *See* ECF Nos. 44-9, 44-12 at 14.

The relationship between the companies apparently soured in October 2017 when Marketsoup asserted that it owned the software code created for the Starlight Application.  ECF No. 44-1 at 22.  On October 31, 2017 Western Star demanded that Marketsoup return all copies of the source code, cease additional software development on behalf of Western Star, and stop

2

using Western Star's confidential information except as authorized. *Id.* On December 23, 2017 Western Star notified Marketsoup that it was terminating the parties' agreement due to Marketsoup's breach of the agreement. *Id.* at 24. In November and December of 2017 Marketsoup allegedly began threatening to shut down the Starlight platform and software application that support Western Star's customers. ECF No. 31 at 2. Marketsoup also began taking steps to patent and/or copyright intellectual property that Western Star claims it owns. *Id.*

### B. **Procedural Background.**

After several specific incidents, including when Marketsoup temporarily locked Western Star out of the platform and began advertising the Starlight Application as its own, Western Star filed a Complaint for Emergency Injunctive Relief and an Emergency Motion for a Temporary Restraining Order before this Court. *See* ECF Nos. 1, 2. On December 8, 2017 the Court held a hearing on Western Star's Amended Emergency Motion for a Temporary Restraining Order and Preliminary Injunction. *See* ECF No. 23. Following the hearing, Marketsoup agreed to transfer control over the source code and software to Western Star. ECF No. 31 at 4. Nonetheless, according to Western Star, Marketsoup continues to claim that it owns this intellectual property and has continued pursuing applications to copyright part or all of the intellectual property.[1] *Id.*

As a result of Marketsoup's continued attempts to assert its ownership of the intellectual property at issue, Western Star filed an amended complaint. *See id.* In this complaint it asserts the following nine claims for relief: (1) a declaratory judgment asserting that Western Star owns all intellectual property rights related to the Starlight Application and that the contract between

---

[1] Western Star's request for expedited declaratory relief implies a concern that some harm will be sustained before the case is decided on its merits. This Court thought that the parties had eliminated that concern by agreement. If there were a new effort by Marketsoup to lock out Western Star from its ability to use its platform, or to take steps that might have that result such as copyrighting the software before the case is decided on its merits, then there might be cause to consider once again whether temporary or preliminary injunctive relief is in order.

3

the parties (as memorialized in the October 2016 draft) is valid and enforceable; (2) a permanent injunction against Marketsoup's disruption of the Starlight Application or its attempt to assert ownership of the related intellectual property; (3) misappropriation of trade secrets under federal law; (4) misappropriation of trade secrets under state law; (5) conversion of Western Star's software, source code, and confidential information; (6) civil theft of Western Star's property; (7) breach of contract; (8) unjust enrichment; and (9) promissory estoppel. *Id.* at 18–24.

Western Star now seeks partial summary judgment on its claim for declaratory judgment with respect to the validity of the contract, or in the alternative on its claim for promissory estoppel; and on its claim for conversion. ECF No. 44 at 14.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing An*derson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

# ANALYSIS

Western Star seeks summary judgment on its claim for declaratory relief with respect to whether the contract is valid and enforceable. ECF No. 44 at 14. In the alternative, Western Star seeks summary judgment its promissory estoppel claim. *Id.* Last, Western Star seeks summary judgment on its claim for conversion. *Id.*

**A. Claim for Declaratory Judgment on the Validity of the October 2016 Contract.**

In its claim for declaratory relief, Western Star asks the Court to declare that the contract between the parties as finalized on October 16, 2016 is valid and enforceable. ECF No. 44 at 10–11. As an initial matter, I agree that it is appropriate for the Court to entertain a claim for declaratory judgment because (1) there is an "actual controversy," and (2) the five *Mhoon* factors weigh in favor of deciding the issue. *Id.* at 11–12 (citing *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008)). The five *Mhoon* factors, which guide a court in deciding whether to exercise its discretion to hear a claim for declaratory judgment, are:

> (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to *res judicata*'; (4) whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (internal citation omitted).

There is an actual controversy in this case: namely, whether there is a valid and enforceable contract. Moreover, a declaratory judgment would settle this controversy and be useful in the context of other related claims in Western Star's complaint. The claim for declaratory judgment does not appear to be used in this context for improper purposes, nor would

5

it infringe on state court jurisdiction.  Finally, because a declaration about the nature of the parties' contractual relationship is necessary for progressing on the other claims between the parties, there is not a more effective or better alternative remedy.

Having decided that it is appropriate for the Court to entertain the claim for declaratory judgment, I now turn to the merits of this claim.  Western Star argues that the final version of the agreement sent by Marketsoup's attorney on October 16, 2016, which Western Star refers to as "the October Contract," is valid and enforceable despite the fact that it was not signed.  ECF No. 44 at 11.  Western Star emphasizes that the parties intended to enter into a binding contract, that they agreed in every draft of the agreement that Western Star would maintain full ownership of intellectual property, and that the parties manifested their assent to the terms of the contract through their conduct.  *Id.*  In contrast, defendants contend that the October draft was merely "a draft of one slice of a broader agreement" being negotiated between the parties which would have included either equity in Western Star or some leadership role in the company for Mr. Weber.  ECF No. 48 at 8.  Defendants claim that they never intended to be bound by the October draft in the absence of other considerations being negotiated orally during most of 2017.  *Id.* at 9. Because this global agreement did not materialize, defendants contend that the unsigned October draft cannot be interpreted as transferring Marketsoup's ownership of its intellectual property to Western Star.  *Id.*

To establish the existence of a valid contract, the evidence must show that the parties agreed upon all the essential terms, as revealed by their manifestations of mutual assent.  *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986).  "[E]vidence of the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and

6

purpose of the parties." *Id.* In this case, the evidence indicates that the parties exchanged various versions of the draft agreements via email. However, as the following summary of these drafts reveals, there is no evidence that the parties came to a complete resolution on the ownership of intellectual property, let alone on all the other "essential terms" of the agreement.

In one of the earliest emails concerning an agreement, on August 29, 2016 Mr. Weber sent Western Star the agreement Marketsoup had used with Motocol to serve as a template. ECF No. 44-5. In that email, Weber noted that he had made a few changes to the agreement, but he concluded that "[a]ll other things are the same and should confer the intellectual property rights you're expecting." *Id.* at 2. In this initial version, Marketsoup would assign to Western Star all of its right, title, and interest to the intellectual property it developed under the SOW. *Id.* at 7, 11. Mr. Weber re-sent the agreement on August 29 and again on August 30, each time with only minor edits. ECF Nos. 44-6, 44-7. On September 7, 2016 Mr. Weber sent Mr. Bradley another version of the agreement with changes reflected in redlines. ECF No. 44-10. In relevant part, this version clarified that the intellectual property at issue included that developed by Marketsoup during its work with Motocol. *Id.* at 4. Mr. Bradley sent back his edits to the agreement on September 16, 2016. ECF No. 44-11. This version reflected significant changes throughout the agreement, including to the ICA section concerning intellectual property; the section of the SOW concerning intellectual property rights was deleted outright. *See id.* at 4. Finally, Mr. Weber's attorney sent back Marketsoup's edits to the agreement on October 16, 2016. ECF No. 44-12. Though this version accepted Mr. Bradley's changes to the intellectual property section of the ICA, it added a new intellectual property rights section to the SOW that was not in Mr. Bradley's version. *See id.* at 16–17. According to this revision Marketsoup

7

would retain a right of first refusal to use intellectual property it created in any industry other than waste hauling. *Id.*

Beyond these provisions concerning intellectual property, Marketsoup's October 2016 version made changes to other sections of the agreement, belying any implication on Western Star's part that the parties agreed on all essential terms. *See* ECF No. 44 at 11. For example, Marketsoup made several considerable revisions to the Representations and Warranties in the ICA, including adding back in a disclaimer providing that Marketsoup made "No Warranties," which Western Star had removed wholesale from its September 16 version. *Compare* ECF No. 44-11 at 14 with ECF No. 44-12 at 7. Marketsoup also changed provisions related to the termination of the agreement. *Compare* ECF No. 44-11 at 23–24 with ECF No. 44-12 at 8. Additionally, Marketsoup's October 2016 version changed Mr. Weber's compensation from $4,000 for 40 hours of work per month to $16,000 for 160 hours of work per month. *Compare* ECF No. 44-11 at 30 with ECF No. 44-12 at 14.

As this brief and inconclusive summary of the revisions reveals, the parties made several significant changes to the agreement as a whole and to the sections regarding ownership of intellectual property in particular between the September 2016 and October 2016 drafts. Given these substantial changes to the agreement, it is not clear that the parties agreed to all "essential terms" of the contract. *I.M.A., Inc.*, 713 P.2d at 888. Western Star asserts that "Western Star accepted the October Contract in full and agreed to all of its terms." ECF No. 44 at 9. There is no evidence in the record to support this assertion, and it strains credulity to believe that Western Star would assent to such significant revisions to the agreement with silence after months of active negotiation. Elsewhere Western Star claims that mere "inadvertent oversight" explains the failure to execute the contract. *Id.* at 2.

Aside from this vague assurance that Western Star accepted the October draft, Western Star also urges the Court to focus on areas of consistency between the final and penultimate versions of the agreement to demonstrate that there was general consensus with respect to intellectual property and billing. *See, e.g.*, *id.* at 9 (Western Star avers that "[t]he October Contract adopted [Western Star's attorney's] IP Ownership Terms verbatim"). However, as noted, the October 2016 draft changed the Intellectual Property section of the SOW, undercutting any argument that this draft was exactly consistent with previous drafts with respect to ownership of intellectual property. *See* ECF No. 44-12 at 16–17. Moreover, even if this draft were exactly consistent with earlier drafts on this topic, it would be improper to view the intellectual property sections in isolation while ignoring the many other substantive changes made in the October 2016 draft. These changes indicate that the parties did not assent to the essential terms of the agreement as a whole. The Court cannot ignore that fact and assume that the parties might nevertheless have intended to enter a binding contract with respect to the ownership of intellectual property despite their failure to reach agreement on other key terms.

I am not persuaded by Western Star's argument that the parties' performance of their duties is proof that they assented to the October 2016 agreement. *See* ECF No. 44 at 12–13. Although the parties continued performing their obligations as they had been before they began negotiations, with Marketsoup developing code for Starlight and Western Star paying Marketsoup for that work, there is no evidence that by doing so Western Star agreed to Marketsoup's October 2016 draft of the agreement. The payment rate for Mr. Weber's subcontractors did not change between the draft agreement sent on August 29, 2016 and the last draft sent on October 16, 2016. *Compare* ECF No. 44-6 at 13 with ECF No. 44-12 at 14. Furthermore, payment records reflect that Western Star paid Mr. Weber according to his earlier

9

rate provided in nearly all of the drafts rather than according to his adjusted rate provided in the October 2016 agreement. *See* ECF No. 44-8 (Marketsoup's invoices to Western Star from 2016 through 2017). Therefore, Western Star's paying Marketsoup according to the payment table contained in the October 2016 draft does not reflect an acceptance of the rest of the agreement any more than it reflects an acceptance of the August 29, 2016 draft of the agreement.

In addition to the fact that there is no evidence of a "meeting of the minds" with respect to the essential terms of the contract, defendants claim that the fact that the agreement was never executed was no mere ministerial oversight, but was instead a conscious decision on Marketsoup's part: "until [Western Star] would come forward and negotiate and document the global agreement contemplated by Defendants, there was never going to be the intent and meeting of the minds for any agreement and no signature." ECF No. 48 at 11. Defendants provide only Mr. Weber's affidavit to support this claim. ECF No. 48-1. Nonetheless, I am satisfied that in combination with the significant changes in the draft agreements and both parties' failure to execute the agreement, defendants' contention that there was some larger negotiation going on supports the existence of a genuine issue of material fact with respect to the validity of the contract.

Mr. Weber's affidavit, coupled with that of his attorney, John Walker, supports the existence of a genuine fact dispute about whether the parties intended to agree to the contract as drafted in October 2016. *See* ECF Nos. 48-1, 22-1, 22-2. Mr. Weber avers that he and Mr. Bradley were negotiating an agreement under which Marketsoup would have an expanded role within a company. ECF No. 48-1 at 3. These negotiations ostensibly included "equity ownership, chief technology officer position, and other related consideration." *Id.* According to Mr. Weber, the exchange of draft documents discussed above dealt only with "the independent

contractor or time and materials part of the arrangement," but "[t]he time and materials payments did not account for Marketsoup's new role." *Id.* at 3–4.

I acknowledge several plausible reasons a jury might doubt Mr. Weber's claims. First, the draft agreements being exchanged between the parties, including the latest version sent by Marketsoup's attorney, included the following language: "This Agreement (including each SOW) represents the entire agreement of the parties regarding the subject matter covered and supersedes all prior oral or written correspondence, agreements, or representations between the parties."[2] ECF No. 44-12 at 6; *see also id.* at 17. This express language contradicts Mr. Weber's statement in his affidavit that "[a]t no time did I or Marketsoup ever agree to or intend that this draft document would be a stand-alone agreement that would be entered into." ECF No. 48-1 at 4. Similarly, the parties' performance according to the terms of the agreement for the year following their negotiations also implies that they intended to enter such an agreement.

Moreover, Mr. Weber's statements in his affidavit may appear "conclusory and self-serving," and as such not sufficient to defeat summary judgment. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995). However in this case, Mr. Weber's allegations are corroborated by his attorney Mr. Walker, who confirmed that he was instructed to negotiate a "complex deal" including, in part, equity ownership for Mr. Weber. ECF No. 22-2 at 4. Moreover, unlike affidavits that are found inadequate to defeat summary judgment, Mr. Weber's affidavit is based on personal knowledge, rather than on rumor or conjecture. *Cf. Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) ("A party to a lawsuit cannot ward off summary judgment with an affidavit . . . based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on *personal knowledge*.'") (quoting Fed. R. Civ. P. 56(e)

---

[2] This version reflects MarketSoup's attorney's most recent rendition of the clause and accounts for the attorney's addition of "or representations" in redline.

(emphasis in original). Additionally, although defendants do not point to any record evidence supporting Mr. Weber's allegations, Mr. Weber's affidavit refers to specific supporting facts, including his allegation that he mentioned to Mr. Bradley "on numerous occasions: that "there was no contract and that the global agreement needed to be signed if he wanted to own the Marketsoup applications." ECF No. 48-1 at 5. Because Mr. Weber's affidavit refers to specific facts based on his personal knowledge and is corroborated by Mr. Walker's affidavit, his affidavit supports the existence of a genuine issue of material fact as to the intent of the parties to enter into the agreement as contemplated in the October 2016 draft.

Therefore, taking into account the significant changes made in the parties' drafts, including to essential terms and provisions involving intellectual property; the parties' failure to execute or sign a final agreement; and Mr. Weber's affidavit averring that there was a larger negotiation going on, I find that there is a genuine issue of material fact as to whether the parties intended to enter into the October 2016 agreement. As a result, Western Star's motion for partial summary judgment on its claim for declaratory relief with respect to the validity of the contract is DENIED.

**B. <u>Promissory Estoppel</u>.**

Having denied Western Star's motion for summary judgment on its claim for declaratory relief, I must next assess its motion for summary judgment on its claim for promissory estoppel in the alternative. Western Star contends that it has proven that (1) Marketsoup made a promise to convey the subject intellectual property to Western Star, and Marketsoup should have reasonably expected this promise to induce Western Star's action or forbearance; (2) Western Star in fact reasonably relied on Marketsoup's promise and acted accordingly; and (3) injustice can be avoided only through enforcing Marketsoup's promise. ECF No. 44 at 13.

For the same reasons noted above with respect to Western Star's request for declaratory relief, I find that Marketsoup has established the existence of a genuine issue of material fact with respect to whether it indeed promised to convey the subject intellectual property and whether it was reasonable for Western Star to rely on that promise. If it is in fact true that Marketsoup and Western Star were engaged in broader negotiations, as Mr. Weber avers in his affidavit, then Marketsoup's apparent willingness to convey the subject intellectual property should not be viewed as a promise but instead as a part of a negotiation that fell through. Similarly, if such broader negotiations were occurring, then it would not have been reasonable for Western Star to rely on Marketsoup's ostensible promises, since Western Star, and its CEO Mr. Bradley in particular, would have known that Marketsoup in fact expected some greater offer before finalizing its end of the bargain.

As a result, Western Star's motion for partial summary judgment with respect to its claim for promissory estoppel is DENIED.

**C. Conversion Claim.**

Western Star's last claim in its motion for partial summary judgment is its conversion claim. Western Star claims that Marketsoup has engaged in conversion by retaining two modules of the Starlight Application—the Billing and Contractor Modules--that it did not work on and was not authorized to access or possess. Marketsoup disputes this claim on the grounds that it merely possesses copies of these modules, while Western Soup retains the original versions of the modules. As such, Marketsoup argues that its retention of these modules cannot constitute dominion over these modules, as required for a claim of conversion.

To succeed on its claim of conversion, Western Star must prove that (1) Marketsoup exercised dominion or control over (2) property belonging to Western Star; (3) Marketsoup's

exercise of control was unauthorized; (4) Western Star demanded return of its property; and (5) Marketsoup has refused to return it. *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1081 (D. Colo. 2012). Western Star claims that Marketsoup's possession of copies of the two modules constitutes dominion over Western Star's property, and that Marketsoup's refusal to return the copies satisfies the test for conversion. ECF No. 44 at 14.

Western Star has not established that Marketsoup has "dominion or control" over Western Star's property. "Retaining computer files—at least where, as here, what is retained is merely a copy of files that remain in the possession of the rightful title holder—is insufficient to show actual dominion of property sufficient to support a conversion claim." *Builder MT LLC v. Zybertech Const. Software Servs., LTD*, No. 08-cv-00435-LTB, 2008 WL 4724146, at *6 (D. Colo. Oct. 24, 2008). Similarly in *Internet Archive v. Shell*, 505 F. Supp. 2d 755, 762–63 (D. Colo. 2007), the Court noted that there was no support for "the notion that copying documents is by itself enough of a deprivation of use to support conversion." Indeed, the court emphasized the weight of precedent finding that possessing copies is insufficient to establish conversion. *Id.*

Western Star does not allege that Marketsoup has deprived it of its original or only versions of the modules, but merely that by holding copies of the modules Marketsoup is "preventing Western Star from controlling distribution and access to its intellectual property." ECF No. 53 at 11. Because the modules that Marketsoup possessed were merely copies of those modules and Western Star retained possession of the original modules, Western Star has failed to establish that Marketsoup was exercising dominion over the modules. As such, Western Star's motion for summary judgment on this claim is DENIED.

## ORDER

For the reasons stated herein, Western Star's motion for partial summary judgment is DENIED.

DATED this 21st day of June, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge